# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **RELIANT CAPITAL SOLUTIONS, LLC,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:22-cv-3047** |
| | : | |
| **v.** | : | **Chief Judge Algenon L. Marbley** |
| | : | |
| **RAM PAYMENT, LLC** | : | **Magistrate Judge Kimberly A. Jolson** |
| | : | |
| | : | |
| **Defendant.** | : | |

## OPINION & ORDER

This matter is before the Court on Plaintiff's Motion for a Preliminary Injunction. (ECF No. 5). This Court held a Preliminary Injunction hearing on September 20, 2022. For the reasons that follow, Plaintiff's Motion for a Preliminary Injunction (ECF No. 5) is **DENIED**.

## I. BACKGROUND

### A. Factual Background

Plaintiff Reliant Capital Solutions, LLC ("Reliant" or "Plaintiff") is an Ohio limited liability company with its principal place of business in Gahanna, Ohio. (ECF No. 1 at ¶ 4). Since 2007, Plaintiff has provided accounts receivable management services under the RELIANT mark. (*Id.*, ¶ 15). In 2017, Plaintiff received federal registration for the mark RELIANT CAPITAL SOLUTIONS, LLC from the U.S. Patent and Trademark Office ("USPTO"), which covers the services "debt collection; debt recovery and collection agencies" and identifies the first use in commerce as January 23, 2007. (*Id.*, ¶ 19–21). Plaintiff conducts business online and maintains a website at www.reliantcapitalsolutions.com, as well as advertising on Facebook, LinkedIn, and at various industry trade shows. (*Id.*, ¶¶ 30–33). Plaintiff utilizes RELIANT in conjunction with its provision of the RELIANT services in different ways, including as part of the logos shown below:

1





(ECF No. 1 at ¶ 27).

Defendant Ram Payment, LLC ("RAM") is an independent account management and payment processing company which acts as a neutral intermediary, capable of providing payment processing services to clients in several industries. (ECF No. 15 at 2). In 2019, Defendant acquired trademark intellectual property assets from Reliant Account Management, which had provided the same services as Defendant for roughly 10 years. (*Id*. at 3). After the acquisition of its assets by Ram Payment, LLC, Reliant Account Management LLC, changed its name to Account Management Systems, LLC. (ECF No. 16, ¶ 6). In mid-2019, the Consumer Financial Protection Bureau ("CFPB") began investigating Account Management Systems, LLC, based on actions taken by its previous owners. (*Id*., ¶ 14). The CFPB investigation ultimately found fault and ordered Defendant and other respondents jointly and severally liable for over $8M in redress. (ECF No. 1 at ¶ 64). As of 2021, all individuals responsible for the actions identified by CFPB are no longer with the company. (ECF No. 15 at 3).

In April 2021, after engaging a creative firm to help redesign its website and logo, Defendant rebranded itself to Reliant and filed a U.S. Trademark Application for the mark RELIANT in connection with the following logo:



(ECF No. 15 at 4). As comparison, Defendant's previous logo included the following mark:



(ECF No. 1, ¶ 45). Defendant has applied to the USPTO to register: (1) the word "Reliant"; and (2) "Reliant" with the ram's head logo. (ECF No. 15 at 4). In and around July 2021, Plaintiff sent a demand letter to Defendant alleging that "[a]tual confusion has occurred as a result of Defendant's rebranding and present use of RELIANT." (ECF No. 1 ¶ 59). One specific incident allegedly involved Plaintiff's actual and prospective customers mistakenly believing that an employee of Defendant was employed by Plaintiff. (*Id*., ¶ 60). Upon receiving the letter from Plaintiff's counsel, Defendant requested that Plaintiff furnish details of this alleged confusion. (ECF No. 15 at 4). While Plaintiff did send some additional correspondence, Defendant was unsatisfied with this response and deemed the matter closed. (*Id*.). In September 2021, Plaintiff's counsel sent a letter reiterating its previous position, which Defendant alleges contained no further details of the confusion. (*Id.* at 5–6). Ten months passed with no communication between the parties, during which the USPTO approved Defendant's applications for word "Reliant" and "Reliant" in the ram's head logo. (*Id.* at 5). Three months later, in May 2022, Plaintiff filed a notice of opposition to Defendant's trademark application, and the parties engaged in an initial conference, where settlement was discussed. (*Id.*).

On August 5, 2022, Plaintiff filed suit alleging irreparable harm if Defendant continues to use the RELIANT brand. (ECF No. 1 at ¶ 69). Plaintiff asserts claims for trademark infringement, unfair competition as well as violations of the Ohio Deceptive Trade Practices Act. (*See generally id*.). Along with its Complaint, Plaintiff filed a Motion for a Preliminary Injunction requesting this

Court enjoin Defendant from using Plaintiff's RELIANT mark anywhere in the United States in connection with any type of account management and payment processing services. (ECF No. 5 at 2).

After Plaintiff filed its Motion for a Preliminary Injunction, this Court held an informal preliminary conference with the parties pursuant to S.D. Ohio Civ. R. 65.1. (ECF No. 14). At that conference, this Court set a briefing schedule on Plaintiff's Motion as well as scheduled a hearing date. (*Id.*). Pursuant to that Order, on August 29, 2022, Defendants responded to Plaintiff's Motion (ECF No. 15) and answered Plaintiff's Complaint (ECF No. 19). As Plaintiff timely replied (ECF No. 21) and the Preliminary Injunction hearing was held (ECF No. 28), the Motion for a Preliminary Injunction is now ripe for review.

### B. Preliminary Injunction Hearing

At the hearing, Plaintiff testified that Defendant rebranded in April 2021 after coming under investigation by the CFPB in 2019. (ECF No. 28 at 11: 4–14). Since that time, Plaintiff alleged that there had been several instances of confusion between Reliant and RAM among their customers and staff. (ECF No. 28 at 59:10–16). For example, one of their clients called to congratulate them on hiring an individual who had actually been hired by Defendant. (*Id.*) Plaintiff, however, did testify that they could not provide evidence that they had lost customers because of confusion between Plaintiff and Defendant's use of RELIANT. (*Id.* at 150:18-151:5). They explained that given the process through which Plaintiff receives most of its contracts, they would be unable ever to know if confusion between them and Defendant played a role in their winning or losing a bid. (*Id.* at 156:17–158:3).

Conversely, Defendant argued that there was no likelihood of confusion between the parties because they were sufficiently different. Defendant presented evidence that it is a

payment processor for debt settlement companies who "simply moves money upon instructions to do so." (ECF No. 28 at 15:19–24). Defendant asserts that debt settlement companies work for consumers to negotiate payment plans with the creditors, but they do not market to consumers nor creditors. (*Id.* at 15:22–16:3; 216:19–217:5). Further, in their post-hearing briefs, Defendant points to Plaintiff's testimony that Reliant does not consider itself just a payment processing firm and that Plaintiff does not consider Defendant to be a third-party debt collector. (ECF No. 28 at 47:21–48:2; 81:5–8). Because of these factors and limited instances of confusion, Defendant argues that an injunction is inappropriate here. (ECF No. 15 at 20).

## II. LEGAL STANDARD

In determining whether a preliminary injunction is warranted, the Court considers four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction." *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 590–91 (6th Cir. 2012). While a strong likelihood of success is the crucial factor, all four must be balanced rather than treated as prerequisites. *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997). Irreparable harm is nearly as crucial as the success factor: It is well settled that "[o]ur frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22–24 (2008).

Preliminary injunctions are a discretionary remedy intended "to maintain 'the status quo' until the resolution of the case 'on its merits.'" *Adams v. Baker*, 951 F.3d 428, 429 (6th Cir. 2020) (quoting *Burniac v. Wells Fargo Bank, N.A.*, 810 F.3d 429, 435 (6th Cir. 2016)). Like the

temporary restraining order, "the preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in limited circumstances which clearly demand it." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (internal quotation marks omitted). Any preliminary injunction must be stated in specific terms, describe in reasonable detail the act or acts to be restrained, and give the reasons for its issuance. Fed. R. Civ. P. 65(d). Moreover, "it should be tailored to restrain no more than what is reasonably required to accomplish its ends." *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 924 (6th Cir. 1978).

A plaintiff need not "establish his right to an injunction wholly without doubt," *Id.* (internal quotation marks omitted); nor "prove his case in full." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). To that end, "[i]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997).

### III. LAW & ANALYSIS

#### A. Likelihood of Success on the Merits

Plaintiff asserts a claim of trademark infringement under 15 U.S.C. §§ 1114. It is well settled that "[t]he touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997). The Sixth Circuit has adopted an eight-factor test for determining likelihood of confusion: "'(1) strength of the plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used;

(6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; [and] (8) likelihood of expansion of the product lines.'" *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982) ("Frisch's I") (quoting *Toho Co., Ltd. v. Sears, Roebuck & Co.*, 645 F.2d 788 (9th Cir. 1981)).

### 1. Strength of Plaintiff's Mark

Plaintiff maintains that its mark is both conceptually and commercially strong, as it "suggests to [consumers] that Plaintiff is dependable, and someone they can rely upon to assist them with their account receivable management needs." (ECF No. 5 at 10). Further, the mark is deserving of a broad scope of protection (*Kimber v.* Hall, 843 F.3d 1068, 1073 (6th Cir. 2016)) because it is suggestive of their business and history of prominence in the industry. (ECF No. 30 at 3). Even though RELIANT is used by other businesses in the industry, Plaintiff argues that they can still enforce their rights against Defendant. (*Id.* at 3–4).

Defendant, meanwhile, argues that Plaintiff's mark is not sufficiently "well known," as there are many coexisting marks on the federal trademark register in the financial services industry that include the term Reliant, including some specifically for the debt collection services that Plaintiff offers. (ECF Nos. 15 at 7–8; 29 at 4; 32 at 2)). Defendant cites to the hearing transcript for examples of other companies who use RELIANT which Plaintiff knew of and admitted offered debt collection services like Plaintiff. (ECF Nos. 29 at 4–5; 28 at 95:12–97:1). Further Defendant points to evidence that Plaintiff consented to "the coexistence of incredibly similar marks" in a blue and green color scheme in an agreement with Reliant Bank, who also offers debt collection services. (ECF Nos. 29 at 5–6; 32 at 3). Plaintiff counters that Defendant's assertion that other companies provide identical services to Plaintiff is false. (ECF No. 31 at 4–5). For example,

Plaintiff asserts that there is no evidence that Reliant Bank offers debt collection services "*for the benefit of others*." (*Id.* at 4).

To evaluate the strength factor under *Frisch's I*, this Court "focuses on the distinctiveness of a mark and its recognition among the public." *Therma–Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 631 (6th Cir. 2002). The fact that a mark has been registered for five or more years is not the end of the inquiry, "[b]ecause the strength of a trademark for purposes of the likelihood-of-confusion analysis depends on the interplay between conceptual and commercial strength," *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012).

This Court finds that Plaintiff's mark is commercially strong. Plaintiff has been using the mark in commerce for fifteen years and the USPTO granted Plaintiff a federal registration for RELIANT CAPITAL SOLUTIONS, LLC in February 2017 in connection with "debt collection; debt recovery and collection agencies." (ECF Nos. 5 at 10; 28 at 83:17–84:5). And, while "the actual strength of the mark cannot and should not be definitively determined at this stage in the matter[,]" the testimony presented and materials produced do demonstrate Plaintiff has taken steps to develop and control the mark and its exclusive right to it. *Hotel California, Inc.*, 106 F. Supp. 3d 899, 906 (N.D. Ohio 2015). As such, Plaintiff's actual use and licensing of the mark, coupled with the absence of a successful challenge to their registration, suggest a degree of strength. *Id.* (citing *Daddy's Junky Music Stores*, 109 F.3d at 282).

This Court does note, however, that Defendant and its predecessor-in-interest, have collectively been utilizing their mark for at least twelve years. (ECF No. 15 at 8). This Court further finds, however, that Plaintiff's mark is not conceptually strong. This is because the term itself is in common use and there are also several coexisting marks in the financial services industry that include the term. (ECF No. 29 at 4–5); *See also Homeowners Grp. v. Home Mktg. Specialists, Inc.*,

931 F.2d 1100, 1108 (6th Cir. 1991) (recognizing that third-party use of a mark may substantially weaken the strength of a mark); *WLWC Centers, Inc. v. Winners Corp.*, 563 F. Supp. 717, 722 (M.D. Tenn. 1983) (finding a mark was weak where, among other things, it consisted of a word that was in common use).

Accordingly, as this Court only finds Plaintiff's mark commercially strong and not conceptually strong, this factor only weighs slightly in favor of a likelihood of confusion.

### 2. Relatedness of the Services

Plaintiff argues that the parties' services are overlapping, or at the very least related. (ECF No. 5 at 11–13). According to Plaintiff, both parties "operate in the account management industry, both work to resolve debts owed by consumers, and both perform payment processing services, including the services recited in Defendant's trademark applications before the USPTO." (*Id.* at 13; ECF No. 30 at 5–7). Although Defendant distinguishes between its indirect work with consumers through debt settlement companies, Plaintiff alleges that the type of customer is irrelevant to Defendants main function—"facilitate payment by consumers/debtors." (ECF Nos. 30 at 6; 31 at 1-2 (citing *NetsJets Inc. v. IntelliJet Grp., LLC*, 678 Fed. App'x 343, 352 (6th Cir. 2017 (the issue is not whether services will be confused, but if there is confusion about their source)). Further, Plaintiff asserts that: (1) they attend the same conference as Defendant with similar clients; and (2) Defendant hired an executive with a history of common clients with Plaintiff. (ECF No. 30 at 6).

Conversely, Defendant maintains that its service is sufficiently different from Plaintiff's because it serves as a financial custodian providing payment transmission services, while Plaintiff represents creditors, purchases debt owed thereto, and seeks to compel debtholders to settle and compromise those accounts. (ECF Nos. 15 at 8; 29 at 6–7). Defendant asserts that it must remain

independent because it is a financial custodian under the Telemarketing Sales Rule and cannot "offer debt collection services." (ECF No. 29 at 7). Second, Defendant rejects Plaintiff's assertion that it competes for business because it attended the same conference, as the conference attendees included companies that did not compete with Plaintiff. (ECF No. 32 at 4). Finally, Defendant's use of the word RELIANT was approved for "financial services, namely, electronic funds transfer via electronic communications network," while Plaintiff's registration of RELIANT CAPITAL SOLUTIONS, LLC covers "debt collection; debt recovery and collection agencies." (ECF No. 29 at 7–8).

The Sixth Circuit has developed "three benchmarks regarding the relatedness of parties' goods and services." *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 624 (6th Cir. 2003).

> First, if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar; second, if the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors; third, if the goods or services are totally unrelated, confusion is unlikely.

*Daddy's Junky Music Stores*, 109 F.3d at 282. Importantly, "[s]ervices are 'related' not because they coexist in the same broad industry but are 'related' if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are [] connected with or sponsored by a common company." *Homeowners Grp.*, 931 F.2d at 1109.

Here, this Court finds that "any commonality between [Plaintiff's] services and [those offered by Defendant] is insufficient to establish that their [services] are related for the purpose of determining whether a likelihood of confusion exists." *Therma-Scan, Inc.*, 295 F.3d at 636. While the parties operate within the same space—debt collection and payment—they preform different functions within that space. Among other services, Plaintiff collects money on behalf of creditors, while Defendant is an independent payment processor that provides technical services on behalf

of debt settlement companies once an agreement is reached between the creditor and debtor. (ECF Nos. 1 ¶ 16; 29 at 6-7). As such, their services are "somewhat related but not competitive[,]" and the likelihood of confusion turns on other factors. *Daddy's Junky Music Stores*, 109 F.3d at 282.

### 3. Similarity of the Marks

Plaintiff argues that the parties' marks are identical. (ECF No. 5 at 14). And, although Plaintiff may present its mark with additional descriptive and/or non-distinctive wording, it maintains RELIANT is the prominent and distinctive part of its branding. (*Id.*; ECF No. 30 at 8–9). Further, Plaintiff alleges that Defendant's trademark application sought to protect the word RELIANT by itself and did not include color in its logo, which represents a different story than told during the preliminary injunction hearing. (ECF No. 30 at 8). Finally, and regardless of the difference in color, the primary brand is the word RELIANT, which Plaintiff argues should be weighed more heavily than the design of the logo alone. (*Id.* at 9).

Defendant maintains that the two marks are substantially different, particularly considering that it uses RELIANT with a different logo from Plaintiff's; Defendant's red and white ram's head differs substantially from Plaintiff's green orbital logo. (ECF No. 15 at 10). Defendant alleges that Plaintiff's logo more closely resembles another company's (Reliant Bank) logo with whom the Plaintiff has a coexistence agreement, but which also uses the word RELIANT and a green and blue circles. (ECF No. 28 at 106:1–6; 207:1–12). Plaintiff asserts, however, that it is distinguished from Reliant Bank which collects money in a different capacity than Plaintiff because there is no evidence that they collect debt for the benefit of others. (ECF No. 31 at 4). Second, Plaintiff does not have a USPTO registration for the word RELIANT alone, while Defendant does. (ECF No. 29 at 8). Finally, the USPTO allowed Defendant's application for RELIANT, despite the existence of Plaintiff's logo. (ECF No. 32 at 5).

It is well settled that "[s]imilarity of the marks is a factor of considerable weight." *Daddy's Junky Music Stores*, 109 F.3d at 283. When evaluating this factor, courts must consider "pronunciation, appearance, and verbal translation of conflicting marks." *Champions Golf Club Inc. v. The Champions Gold Club, Inc.*, 78 F.3d 1111, 1118 (6th Cir. 1996). In addition, "courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection' of the other party's mark." *Daddy's Junky Music Stores*, 109 F.3d at 283 (internal quotations omitted).

The parties' marks are quite similar, particularly given that each emphasizes the term "Reliant." Each mark, however, does contain additional details that do differentiate them from one another. Specifically, Plaintiff's mark includes the words "capital solutions" as well as a green orbital logo, while Defendant's contains a distinctive ram's head figure. (ECF Nos. 5 at 3–4; 15 at 10). These kinds of differences, however, "relate to the marks' 'individual features' rather than their 'overall impression[].'" *Therma-Scan, Inc.*, 295 F.3d at 633–34 (6th Cir. 2002). Based upon these considerations, this Court finds that an average consumer might be unable to recall which trademark identifies Plaintiff's services as opposed to Defendant's. The similarity of the marks thus increases the likelihood of confusion, although the presence of the ram's head figure in Defendant's mark decreases the significance and strength of this factor.

### 4.  *Evidence of Actual Confusion*

Plaintiff presents three categories of actual confusion: (1) a third party tagged Plaintiff in a social media post about Defendant; (2) Plaintiff received phone calls from clients and their own employees inquiring about Plaintiff's decision to hire an executive who had actually been hired by

Defendant; and (3) Plaintiff received at least one inquiry from a customer about the CFPB enforcement proceeding against Defendant and was confused about whether Plaintiff was the one involved. (ECF Nos. 5 at 15; 30 at 10). Plaintiff argues that these examples of confusion are persuasive, because the likelihood of confusion analysis should not be limited to confusion amongst purchasers, but should include other, casual observers. *Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1245 (6th Cir. 1991). Defendant argues that the law does not recognize these instances as sufficient evidence of actual confusion. (ECF No. 15 at 10–12). Moreover, Defendant asserts that these instances "are not a considerable quantum of evidence of actual confusion, and minimal or isolated instances of actual confusion are . . . less probative than a showing of substantial actual confusion." (*Id*. at 11) (internal quotations omitted). Defendant highlights that the social media post was an isolated incident that happened in April 2021, constitutes stale evidence, and fails to demonstrate that the tag was intentional. (ECF Nos. 29 at 10; 32 at 6). Further, the email inquiring about the CFPB proceedings specifically expressed the belief that Plaintiff was not involved but was writing to confirm. (ECF No. 29 at 10). Defendant asserts that inquiries about a logo do not amount to actual confusion. *Id.* (citing *Nora Beverages, Inc. v. Perrier Grp. Of Am., Inc.*, 269 F.3d 114,124 (2d Cir. 2001)).

While "[e]vidence of actual confusion is undoubtedly the best evidence of likelihood of confusion," it does "not follow that lack of evidence of actual confusion should be a significant factor . . . ." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir. 1988). "The existence of only a handful of instances of actual confusion after a significant time or a significant degree of concurrent sales under the respective marks, [however,] may even lead to an inference than no likelihood of confusion exists." *Homeowners Grp.*, 931 F.2d at 1110.

Plaintiff's evidence of actual confusion resembles the testimony of 18 consumer witnesses in *Jewel Companies, Inc. v. The Westhall Company*, 413 F. Supp. 994 (N.D. Ohio 1976). In *Jewel*, the court discounted the consumer statements noting:

> Their statements indicated that they "thought" that there "might" be a relationship between the two [or] they "assumed" that there was a relationship . . . This is a very weak degree of confusion. The strongest confusion would have been that which resulted in a customer going to Jewel Mart and making a purchase because the customer thought the store was operated by Jewel Tea.

*Id*. at 999. Although the customer and employee inquiries and social media post establish at least some evidence of actual confusion, such "occasional instances of confusion . . . has generally been held to be non-probative." *Empire Nat. Bank of Traverse City v. Empire of Am. FSA*, 559 F. Supp. 650, 656 (W.D. Mich. 1983). Accordingly, "[t]his factor [] does not tilt the balance of determining whether a likelihood of confusion exists to a significant degree in either direction." *Therma-Scan, Inc.*, 295 F.3d at 636.

### 5. *Marketing Channels Used*

Next a court must "consider the similarities or differences between the predominant customers of the parties' respective goods or services. Further, a court must determine whether the marketing approaches employed by each party resemble each other." *Daddy's Junky Music Stores*, 109 F.3d at 285 (internal citation omitted). According to Plaintiff, the parties use identical marketing channels, including their websites starting with the word RELIANT, as well as Facebook and LinkedIn. (ECF Nos. 5 at 15–16; 30 at 12). Defendant maintains that simply because both parties market on the internet, that does not "automatically lead to the conclusion that they use common marketing channels." (ECF No. 15 at 12). In fact, Defendant argues that its website (www.reliantpayment.com) "reinforces that Defendant's business is payment services, which is distinct from debt collection." (ECF No. 29 at 12). Moreover, Defendant argues that the parties

market to different customers, with Defendant targeting debt settlement companies and Plaintiff targeting creditors. (*Id*. at 11–12).

Plaintiff's website and social media are certainly marketing tools. The existence of these as marketing tools, however, is hardly unique to these two companies. Were advertising on the internet enough to find a significant overlap in marketing channels used, this factor would soon become meaningless in the analysis. Instead of simply looking at the existence of a website and social media accounts, then, the Court must analyze the entire "marketing approaches used by each party." *Daddy's Junky Music Stores*, 109 F.3d at 285. Viewed through that lens, Plaintiff has failed to establish that its marketing approach bears any significant resemblance to Defendant's. There is no evidence that the same types of people are targeted by both organizations—Plaintiff markets to creditors, while Defendant markets to debt settlement companies. (ECF Nos. 29 at 11). While both parties advertise on the internet, there is insufficient evidence that their marketing approaches are similar enough to warrant a finding of likelihood of confusion.

### 6.  *Likely Degree of Purchaser Care*

Plaintiff argues that when the marks are nearly identical, the weight of this factor is less significant. (ECF No. 5 at 16). Even a consumer that might exercise care or is highly sophisticated would still likely be confused because Defendant is using a mark that is identical to Plaintiff's. (*Id*.; ECF No. 30 at 13). Defendant maintains that its clients, sophisticated financial companies, exercise significant diligence and would not mistake a payment processor for a debt collector. (ECF Nos. 15 at 13; 30 at 12). Further, Defendant must partake in "tremendous technical and operational" onboarding, due diligence, and integration for their clients. (ECF No. 32 at 8).

"The degree of care with which consumers likely purchase the parties' goods or services may affect the likelihood of confusion. . . . The ultimate significance of a given degree of care,

however, often will depend upon its relationship with the other seven factors." *Daddy's Junky Music Stores*, 109 F.3d at 285.

> Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution. However, when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is proper. Similarly, when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases. When services are sold to such buyers, other things being equal, there is less likelihood of confusion.

*Homeowners Group*, 931 F.2d at 1111. Given the complexity of the industry, the parties' services are not those which are normally subject to impulse buying. *Empire Nat. Bank of Traverse City v. Empire of Am. FSA*, 559 F. Supp. 650, 656 (W.D. Mich. 1983). Given this higher level of care, as well as the difference between the parties' services, this Court finds that there is less likelihood of confusion between the parties' marks. *Honorable Ord. of Kentucky Colonels v. Bldg. Champions, LLC*, 345 F. Supp. 2d 716, 723 (W.D. Ky. 2004) ("A greater than usual degree of purchaser care lessens the likelihood of confusion between two products with similar marks."); *see also Empire Nat. Bank*, 559 F. Supp. at 656 (recognizing that court have generally held that customers in complex financial industries, such as banking, "exercise a greater degree of care than do customers of other businesses"). With that said, however, "confusingly similar marks may [still] lead a purchaser who is extremely careful and knowledgeable . . . to assume [] that the seller is affiliated with or identical to the other party." *Daddy's Junky Music Stores*, 109 F.3d at 286. Considering that, this Court finds that the high degree of care Defendant's customers would presumably exercise weighs only somewhat against finding a likelihood of confusion.

### 7. *Defendant's Intent in Selecting the Mark*

Plaintiff represents that Defendant's conduct has been willful since at least July 2021, when it first contacted Defendant and asked it to cease from further use of the RELIANT mark. (ECF

No. 5 at 16). Defendant's use of a contested mark with the knowledge of the protected mark, argues Plaintiff, can support a finding of intentional copying. (*Id*.). At the Preliminary Injunction hearing, Plaintiff testified that their CEO had worked extensively with one of Defendant's executives who was fully aware of Plaintiff's business name. (ECF No. 30 at 13). Defendant maintains that its decision to truncate its name by removing "Account Management" hardly constitutes evidence suggesting that it sought to cause marketplace confusion. (ECF Nos. 15 at 13; 29 at 13). It also asserts that when it shortened its name, it added the ram's head logo as "an intentional bridge to its longstanding 'RAM' industry moniker." (ECF No. 29 at 13). According to Defendant, it would not have wanted to confuse itself with Plaintiff, given Plaintiff's less than stellar professional reputation. (ECF Nos. 15 at 14; 29 at 14). Further, it decided to refresh the brand in spring 2020 and engage a creative company in summer 2020, which occurred 13 months prior to Defendant learning about Plaintiff. (ECF No. 32 at 8–9).

It is well settled that "[i]f a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." *Homeowners Group*, 931 F.2d at 1111. A plaintiff need not provide direct evidence that a defendant intentionally copied a mark; establishing instead that the defendant used the mark with knowledge of the mark's protection can be sufficient to support a finding of intentional copying. *Id*. In addition, knowledge can be presumed upon proof of "extensive advertising and long-term use of a protected mark." *Champions Golf Club*, 78 F.3d at 1121 ("[U]se of a mark with knowledge of another's prior use of the mark supports an inference of intentional infringement."). The Sixth Circuit has rejected the view that the mere "existence of a registered mark demonstrates that the alleged infringer intentionally copied the mark," reasoning that under such a rule, "presumably all trademark infringement cases could result in a finding of intentional copying." *Daddy's Junky Music Stores*,

109 F.3d at 286–87. The existence of a registered mark does "constitute[ ] some circumstantial evidence that [a] defendant was aware of [a particular mark]." *Id.* at 287.

As Plaintiff's mark has been registered, there does exist some evidence that Defendant intentionally copied Plaintiff's mark. Moreover, Defendant was aware of Plaintiff's mark since at least July 2021, when Plaintiff's counsel sent Defendant a demand letter. (ECF No. 5 at 16). As Defendant points out, however, "the appropriate 'intent' to focus on is not the intent to copy but rather the intent to deceive or confuse." *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 514 (6th Cir. 2013); *Ferrari S.P.A. v. Roberts*, 944 F.2d 1235, 1243 (6th Cir. 1991) (asking whether the intent was "to deceive purchasers and thus derive a benefit from another's name and reputation" or "rather to avail oneself of a design which is attractive and desirable").

Upon review of the record, this Court finds no evidence that Defendant had any intent to deceive or confuse consumers when it rebranded. Rather, the impetus behind Defendant's rebrand was to revitalize following the adverse ruling from the CFPB. While Plaintiff has provided some evidence to support a presumption that Defendant knew of the mark's protection, it has not provided any evidence that Defendant intentionally copied its mark. *Nat'l K-9, Inc. v. Nat'l Canine Assoc., Inc.*, 2009 WL 10679476, * 6 (S.D. Ohio Dec. 10, 2009). Accordingly, this factor only somewhat supports a finding of likelihood of confusion.

### 8. *Likelihood of Expansion of the Product Lines*

Plaintiff maintains that both parties service a variety of different types of clients, and it is entirely foreseeable, and probable, that both will continue to expand their customer base. (ECF No. 5 at 17). Plaintiff testified that as a result of losing contracts due to COVID, the company plans to expand its offerings to include first party, customer service through a call center and wants to expand into the healthcare and financial services industry. (ECF No. 30 at 14). Plaintiff alleges

that Defendant is also seeking to expand its services because its website says it provides services to a wide variety of other parties beyond debt settlement companies. (*Id.*). Defendant disagrees, arguing that Plaintiff is prohibited by law from expanding to the market of services provided by Defendant, and vice-versa. (ECF No. 15 at 8). Because it is a dedicated financial custodian, Defendant represents that the Telemarketing Sales Rule (16 C.F.R. § 310) requires that it remain independent from debt settlement companies like Plaintiff. (*Id.* at 9). Finally, Defendant has no plans to expand its services. (ECF No. 32 at 9).

A "'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Homeowners Group*, 931 F.2d at 1112. Such expansion could include "[a] geographic expansion or an increase in the types of products or services offered . . . ." *Daddy's Junky Music Stores*, 109 F.3d at 287. Mere speculation that one of the parties may, at some undefined point in the future, expand its business in such a way as to compete with the other party is not sufficient to warrant a finding of likelihood of confusion. *See, e.g., Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1450 (S.D. Ohio 1990) (finding plaintiff's possible expansion into defendant's market too speculative to warrant a finding of likelihood of confusion, in part because plaintiff had not signed a purchase agreement); *cf Champions Golf Club*, 78 F.3d at 1122 (finding potential confusion resulting from expansion where both parties—local golf clubs—had already hosted national golf tournaments and intended to do so again in the future).

Here, there is little direct evidence that either party will expand their businesses to compete with the other or be marketed to the same consumers. Plaintiff's claim that the parties *may* continue to expand their customer base and services is simply too speculative at this point. *Nat'l K-9, Inc.*,

2009 WL 10679476, * 6 (emphasis added). This is insufficient for the Court to find that this factor supports a finding of likelihood of confusion.

After weighing all eight factors to be considered when determining the likelihood of confusion, the Court finds that only three of the factors—strength of the plaintiff's mark, the similarity of the marks and Defendant's intent in selecting its mark—weigh in favor of finding a likelihood of confusion. And even these factors, weigh only slightly in Plaintiff's favor. While the Court is aware that these factors are not to be applied with any sort of mathematical precision, the overall findings left after evaluating all eight factors is that Plaintiff has failed to establish a likelihood of confusion resulting from Defendant's use of the "RELIANT" mark, and the Court therefore finds no likelihood of success on the merits.

### B.  Irreparable Injury

Plaintiff emphasizes that irreparable harm is presumed from Defendant's infringement. (ECF No. 5 at 18 (citing *Daimler Chrysler v. The Net Inc.*, 388 F.3d 201, 208 (6th Cir. 2004)). This presumption aside, Plaintiff argues that Defendant's use of Plaintiff's mark poses a certain and immediate threat of irreparable harm to Plaintiff's reputation and goodwill, particularly given the recent CFPB enforcement action against Defendant. (*Id.*). Plaintiff asserts that it routinely submits RFPs for government contracts, which requires it to disclose any ongoing lawsuits. (ECF No. 30 at 16). Because government agencies are sensitive to the company's reputation, Plaintiff is concerned that they may lose business if they are further associated with Defendant. (*Id.*: ECF No. 31 at 7). Further, it points out that Defendant's reference to Plaintiff's negative reputation serves only as a distraction without any substance. (ECF No. 30 at 17). Defendant responds that it has sufficiently rebutted the presumption of irreparable harm, and moreover, Plaintiff's delay of 380 days before suing and moving for injunctive relief fully rebuts Plaintiff's claim of irreparable harm.

(ECF No. 15 at 15–16). Defendant maintains that Plaintiff "has adduced only speculative assertions to show irreparable injury." (*Id.* at 17; ECF No. 29 at 15). Defendant points to the preliminary injunction hearing transcript and offers examples of several occasions in which Plaintiff conceded that it has not suffered injury as a result of Defendant's use of RELIANT. (ECF No. 32 at 9; *see also* ECF No. 28 at 156:17–158:3; 168:12–169:24). At most, Defendant's argue that Plaintiff has only asserted that "prospective higher education clients *might* confuse Defendant for Plaintiff." (ECF No. 29 at 15).

Where a plaintiff can show a likelihood of success on the merits of its trademark claims, a court may presume irreparable injury. *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1460 (S.D. Ohio 1990). A showing of likelihood of confusion, however, does not mandate a finding of irreparable injury. *National Bd. of YMCA v. Flint YMCA*, 764 F.2d 199, 201 (6th Cir. 1985). In this case, this Court finds no likelihood of confusion and therefore no likelihood of success on the merits. As a result, this Court will not presume the existence of irreparable injury. Indeed, the Sixth Circuit has held that "a finding that a party was not 'likely to prevail' on the merits would not preclude a court from exercising its discretion to issue a preliminary injunction, if the movant 'at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant . . . .'" *Frisch's Restaurant Inc. v. Shoney's Inc.* (*Frisch's II*), 759 F.2d 1261, 1270 (quoting *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)).

Plaintiff has not shown that it will suffer irreparable injury in the absence of immediate injunctive relief. Plaintiff claims that its reputation and goodwill have suffered in the community as a result of Defendant's actions, yet has adduced no such evidence. Plaintiff has not produced any market studies of name recognition, any figures of lost sales, or any evidence of actual

confusion—other than the limited few already analyzed by this Court. Accordingly, as these alleged injuries are completely speculative, and Plaintiff has failed to show a serious question as to the likelihood of success, this factor does not weigh in favor of issuing an injunction.

### C. Harm to Third Parties

Here, Plaintiff argues that any harm caused to apparent infringers is not entitled to consideration when balancing the injuries and determining whether or not injunctive relief should issue. (ECF Nos. 5 at 19; 30 at 17-18). Furthermore, Plaintiff maintains it has made a substantial investment of time and money in its mark as opposed to the investment by Defendant. (ECF No. 5 at 19). Because Defendant recently completed a brand change, Plaintiff alleges that Defendant can make another and has failed to explain why such a change would impact its activities. (ECF No. 31 at 8). Defendant, meanwhile, argues that the concrete and immediate harm it would face strongly weighs against an injunction. (ECF No. 15 at 18–19). Were this Court to grant Plaintiff's Motion, Defendant represents it would be required to modify its money transmitter licenses, operating licenses, and contracts as well as change its website, business cards, promotional materials, and trade booth materials. (*Id.*; ECF Nos. 28 at 22:24–23:9; 29 at 16-17). As a 30-person company, Defendant asserts that such an effort would require that it divert attention away from other projects at substantial cost. (ECF No. 29 at 17). Defendant estimates that an injunction would cost Defendant approximately $1,900,000, result in lost new-customer enrollments, and delayed onboarding of a new client. (*Id.*). Finally, Defendant argues that an injunction would not avoid the speculative harm of losing a government contract that Plaintiff raises. (ECF No. 32 at 10).

In a trademark case, if the movant can show a likelihood of success, then the harm to others caused by an injunction will likely consist in part of the non-movant's lost profits from sales of the apparently infringing articles and a loss of the money expended on promotional materials and

advertising. Such harm caused to apparent infringers, however, is not entitled to consideration in assessing the harm caused by an injunction. *See Central Benefits Mutual Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F.Supp. 1423, 1435 (S.D.Ohio 1989). Of course, courts may have to consider harm to persons other than the infringer, but in most cases, only the fortunes of the plaintiff and defendant are at stake. Accordingly, if the plaintiff alleging trademark infringement can show a likelihood of success, the "harm to others" factor of the preliminary injunction standard would normally favor the plaintiff as well.

This Court has not found that Plaintiff will suffer any irreparable harm absent injunctive relief. Moreover, Plaintiff has not shown a likelihood of success on the merits as there is not sufficient evidence of a likelihood of confusion. An injunction would, however, cause substantial harm to Defendant because it would require affirmative, costly steps to alter Defendant's use of its mark. *D & J Master Clean, Inc. v. Servicemaster Co.*, 181 F. Supp. 2d 821, 831 (S.D. Ohio 2002). Because there is no likelihood of confusion, Defendant is not considered an "apparent infringer" and this Court can consider any harm it may suffer from an injunction. As an injunction in this case would cause substantial harm to Defendant, the Court finds that Plaintiff has not demonstrated that the balance of hardships tilts in Plaintiff's favor.

### D. Public Interest

Plaintiff argues that the public would be well-served by an injunction in this case, because both parties are interacting with people who owe money to others, and both creditors and debtors deserve their interests to be protected. (ECF No. 30 at 19). They further allege that it is a mistake to defer to the USPTO's decision, because the USPTO did not have the opportunity to review the current facts. (ECF No. 31 at 9). Defendant argues that a brand change would disrupt the continuity of services offered to Defendant's customers, which is not in the public interest. (ECF No. 29 at

18). Defendant encourages this Court to defer to the "expert decision of the USPTO's examining attorneys, who allowed both of Defendant's 'Reliant' mark." (*Id.*).

In a trademark case, the public interest may be served by issuing an injunction where it would prevent confusion among consumers in the marketplace. *See Worthington Foods*, 732 F. Supp. at 1463. Because the Court found no likelihood of confusion in this case, however, that interest would not be served by issuing an injunction.

### IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for a Preliminary Injunction (ECF No. 5) is **DENIED**.

      **IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: November 18, 2022**